Campbell, Chief Justice,
delivered the opinion of the court:
The claimant seeks to recover the net proceeds of 77 bales of cotton which it is alleged belonged to claimant, and were seized and sold by agents of the Federal Government subsequent to June 1, 1865, and the proceeds of the sale covered into the Treasury.
The suit is predicated upon the act of March 3, 1911, carried into the Judicial Code as section 162 and reading as follows:
“ The Court of Claims shall have jurisdiction to hear and determine the claims of those whose property was taken subsequent to June the first, eighteen hundred and sixty7five, under the provisions of the act of Congress approved March twelfth, eighteen hundred and sixty-three, entitled ‘An act to provide for the collection of abandoned property and for *72 the prevention of frauds in insurrectionary districts within the United States,’ and acts amendatory thereof where the property so taken was sold and the net proceeds thereof were placed in the Treasury of the United States; and the Secretary of the Treasury shall return said net proceeds to the owners thereof, on the judgment of said court, and full jurisdiction is given to said court to adjudge said claims, any statutes of limitations to the contrary notwithstanding.”
Said section refers specifically to the act of March 12,1863, commonly called the abandoned or captured property act, which is not to be confounded with the enactments known as the confiscation acts. For, as said by Judge Howry in a former opinion in this case upon another phase of it:
“The confiscation acts, it has been held, were penal, the abandoned or captured property act remedial; the one claimed a right, the other conceded a privilege. For this reason these acts were construed not to be in fari materia, and could not be, according to Anderson's case, 9 Wall., 67, where it was held that the confiscation laws were predicated strictly upon the right to seize and condemn property as a punishment.” 49 Ct. Cls., 300.
By the abandoned or captured property act the Court of Claims was designated as the sole forum of original jurisdiction of suits brought under that act, and very many suits were brought by persons seeking to avail themselves of its privileges. As said by Mr. Justice Strong, in the Elgee Cotton cases, 22 Wall., 180, 185:
“That statute [act of March 12, 1863] furnishes'a complete system for the prosecution of claims under it, and defines the extent of the rights which those who claim an interest in the proceeds of property captured or abandoned during the Civil War, may assert against the Government. According to the well-known rules of statutory construction, the system is exclusive of all others, and the rights defined are the only ones which can be enforced in any judicial proceeding. The language of the act makes it plain that no one is allowed to sue in the Court of Claims for the proceeds of • captured or abandoned property unless he can prove to the satisfaction of the court three things: First, his ownership of the property seized; secondly, his right to the proceeds thereof; and, thirdly, that he never gave aid or comfort to the rebellion. The third, it is true, has been ruled by this court to be no longer necessary since the amnesty proclama *73 tions, but the ownership of the property at the time of the seizure and the right to the proceeds thereof are still indispensable to any standing in court as a claimant for the proceeds of property captured, which have been paid into the Treasury of the United States.”
Many suits which had been brought failed because of the inability of the claimants to establish their loyalty before the general amnesty proclamation, and the period provided in the statute for the bringing of suits expired in two years from the termination of the war, which was officially declared to be ended on August 20, 1866. No suit could therefore be brought under that act after August 20, 1868.
The effect of section 162 is to revive the abandoned or captured property act so far as the remedies it provided are concerned and to again provide a forum for the enforcement of the rights declared in said section 162.
A very material requirement of said act of March 12,1863, is n'ow eliminated, namely, the proof of loyalty. (See former opinion in this case upon that question.) But aside from loyalty said statute made the right to recover depend on proof of ownership of the abandoned or captured property or of right to the proceeds: “ the ownership to be proved is that which existed at the time of abandonment or capture and the right to the proceeds is that which existed at the time of the petition filed in the Court of Claims.” Carroll case, 13 Wall., 151; Ross case, 92 U. S., 281; The Elgee Cotton cases, 22 Wall., 180.
But it does not seem to have been essential to recovery that proof be made of a legal title to the property which had been sold, for in Villalonga’s case, 90 U. S., 35, a factor’s lien was enforced to the extent of his advances on cotton belonging to his principal, it being declared in that case that the “ owner ” spoken of in the act, “ having a right to the proceeds thereof,” is he who has the legal interest in those proceeds. The factor was accordingly allowed to recover of the proceeds in the Treasury to the extent of his interest, which was measured by the amount of his advances on the cotton which had been sold.
And in Erwin's case, 97 U. S., 392, it was held that the claim to the proceeds in the Treasury would pass to an assignee in bankruptcy.
*74 In one of the earliest cases arising under the abandoned or captured, property act, United States v. Klein, 13 Wall., 128, the Supreme Court decided that “ the Government constituted itself the trustee for those who were by that act entitled to the proceeds of captured or abandoned property and for those whom it should thereafter recognize as entitled.” Referring further to the act, it is there said, page 139:
“This language makes the right to the remedy dependent upon proof of loyalty, but implies that there may be proof of ownership without proof of loyalty. The property of the original owner is in no case absolutely divested. There is, as we have already observed, no confiscation, but the proceeds of the property have passed into the possession of the Government, and restoration of the property is pledged to none except to those who have continually adhered to the Government. Whether restoration will be made to others or confiscation will be enforced is left to be determined by considerations of public policy subsequently to be developed.”
This trust-fund doctrine was recognized in the Villalonga case, supra; Lamar v. Browne, 92 U. S., 187; and in Intermingled Cotton cases, 92 U. S., 651. Replying to the Government’s contention that the plan of apportionment adopted in the last-named case was erroneous, the court, speaking by Mr. Chief Justice Waite, said:
“ The aggregate of the whole is no more than the amount of money in the Treasury to the credit of the fund, and which, as we have often decided, is a trust for the benefit of such as should establish their claim to it under the provisions of the abandoned or captured property act.”
Construing section 162 as giving to designated persons the same right to maintain their suits which they would have had if they were loyal or pardoned persons suing under the abandoned or captured property act, there appear to be at least two fatal obstacles to a recovery by the claimant here.
1. The facts show that claimant had sold his cotton to the “Confederate States of America ” and therefore he can not recover. This conclusion follows here not upon the theory that by his sale he committed a disloyal act toward the Federal Government, for that feature is eliminated, but upon the ground that he was not the owner of the property sold. *75 The Whitfield case, 92 U. U., 165, precludes him upon this point.
2. If he could otherwise recover he must fail here because he can not trace the proceeds of the sale of cotton alleged to have been taken from him into the Treasury. This results from the facts found that the Government’s agents in the district where the cotton in question was seized took possession of something over 30,000 bales of cotton of which somewhat in excess of 16,000 bales were sold and the net proceeds of the sales covered into the Treasury.
The evidence does not disclose that the particular cotton in question, or any of it, was a part of the 16,334 bales. For aught that appears all of it may have been destroyed by the fire, which is shown in the agent’s reports to have burned about 6,000 bales of the cotton seized by him or it may have been lost along with the balance. It appears that the 16,334 bales which were sold were not marked for identification. In the Ross case, 92 U. S., 281, it is said to be incumbent upon a claimant under said act—
“to establish by sufficient proof that the property captured or abandoned came into the hands of a Treasury agent; that it was sold; that the proceeds of the sale were paid into the Treasury of the United States and that he was the owner of the property and entitled to the proceeds thereof. All this is essential to show that the United States is a trustee for him, holding his money.”
And, concluding, the court said:
“It is not found as,a fact that the identical cotton captured from the plaintiff ever came into the hands of a Treasury agent or that it was sold and that the proceeds were paid into the Treasury.”
The claimant seems to rely upon the doctrine of the Intermingled Cotton cases, 92 U. S., 651, where the proceeds were divided among the owners of the cotton according to their original number of bales, where the cotton had been intermingled in a common mass; but the principle upon which that case proceeds is not applicable here. There all the claimants were before the court, none objecting to the apportionment, and as none were asserting a right to any specific *76 cotton or its proceeds the court held the whole would be equitably divided between them.
In the instant case the claimant seeks to recover for 77 bales which constituted a part of 30,610 bales collected, of which only about 16,000 bales (or, to be exact, 53.4 per cent) found their way, in the shape of proceeds, into the Treasury. We certainly could not give judgments to all claimants for their individual claims on the basis of 30,610 bales collected, because that would amount to paying them nearly twice as much as there is of the particular fund in the Treasury. Nor can we assume that others whose claims are pending for cotton, forming parts of the 16,334 bales, may not show that their identical cotton went to form the aggregate of 16,334 bales which were sold. At least they separately would have a right to make such proof, if they can, as well as a right to object to the appropriation of proceeds to persons who can not identify the cotton claimed, and a consequent diminution thereof until their claims are considered. If all were before the court, the rule approved in Intermingled Cotton cases might be applied.
We think the view urged upon us that section 162 was intended to authorize parties who had sold their cotton to the Confederate States to sue for the proceeds of the sale of that cotton in the Treasury — or, in other words, that by the enactment of that section the Congress in effect intended the court to disregard the decision in the Whitfield case — is untenable.
We must construe a statute according to the plain import of its language, and the section in question is not susceptible of the construction that the “ claims of those whose property was taken” who are later referred to as “the owners” of the net proceeds means persons who had sold their cotton and were therefore not the “ owners thereof ” or of the net proceeds.
If the Congress had intended to change the effect of the Whitfield case, they could have used more apt language. While debates in Congress are not the appropriate source for ascertaining the intention of the act, we may at times refer to them for a history of the enactment; and so referring to the debates (vol. 46, Cong. Rec., 61st Cong., 3d sess., *77 p. 2163) it is shown that no reference was made to the Whitfield case or to “ Confederate cotton.” When we give to the language of section 162 the same meaning that similar words or phrases in the earlier act have been given, and eliminate from the latter any necessity for proof of loyalty and the period of limitation, we have given full effect to. said section 162 unless the words of said section, “ full jurisdiction is given to said court to adjudge said claims,” can be referred to any claim or lien which a claimant may establish and unless “property” as used in the said section is broad enough to include any legal or equitable right or interest in the property sold or its proceeds.
As above suggested, the abandoned or captured property act authorized suit by “any person claiming to have been the owner” of the property seized and sold to recover the net proceeds of the sale covered into the Treasury. These net proceeds were in the nature of a trust fund held for those who could bring themselves within the terms of the act, or who might thereafter be authorized to maintain suits. Klein’s case, 13 Wall., 128. “The right to the proceeds is that which existed at the time the petition was filed in the Court of Claims.” Carroll’s case, 13 Wall., 151. It was not necessarily a legal title to the property sold, but an equitable right in the trust fund, which was necessary to sustain the action, and a factor’s lien was accordingly enforced to the extent of his advances upon certain cotton. The Villalonga case, 90 U. S., 35. In Thomas’s case, 12 C. C., 273, Judge Nott, speaking for the court, declared that a suit under said act was “ a suit in equity against a specific fund ” partaking of a proceeding in rem.
Even if it should be conceded that the language of section 162 is broad enough to include claims of liens, the result here would not be altered.
Stating the proposition, to answer it:
It is said by Mr. Benjamin that where goods have not left the actual possession of a vendor he has at common law, at least, a lien for the unpaid price. 2 Benjamin on Sales, fourth edition, section 1130, and the rule finds support in American cases. McElwee v. Metropolitan Lumber Co., 69 Fed., 302; Bohn Manufacturing Co. v. Haynes, 83 Wis., 388; *78 Arnold v. Delano, 4 Cush., 33; Conrad v. Fischer, 37 Mo. App., 352; Cragin v. O'Connell, 63 N. Y. Supp., 1071 (169 N. Y., 563); Crummy v. Roudenhush, 55 Minn., 426. The cotton in question was taken from the possession of claimant’s intestate after June 1,1865, under an order issue to the Federal agent to collect “ cotton purchased by and now held on account of the so-called Confederate States Government.” We need not consider any question of a vendor’s lien because the 'Whit-field case concludes us.
The petition is dismissed.
Booth, Judge, BarNey, Judge, and AtkiNSON, Judge, concur in the foregoing opinion.